J-S33016-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| T.L.C. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| J.W.K. | : | |
| | : | |
| Appellant | : | No. 585 EDA 2020 |

Appeal from the Order Entered January 13, 2020
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
No. 2011-FC-1433

BEFORE:   DUBOW, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY MURRAY, J.:                    **FILED AUGUST 14, 2020**

J.W.K. (Father) appeals from the order granting T.L.C.'s (Mother) petition to modify the existing custody order, and awarding her sole legal custody with respect to their daughter, O.K., born in March 2002; son, J.K., born in November 2003; daughter, G.K., born in December 2007; and son, N.K., born in February 2010 (collectively, Children).  The order further grants the parties shared physical custody as they may agree.  In the absence of an agreement, the order grants Mother primary physical custody and Father

_____

[*] Former Justice specially assigned to the Superior Court.

partial physical custody on alternating weekends and one evening every week.[1]  Upon careful review, we affirm.

This case commenced in November 2011, when Mother filed a divorce and custody action against Father.  By consent order dated January 6, 2012 (original order), Mother and Father were granted shared legal and equally shared physical custody of the Children on an alternating weekly basis with the non-custodial parent having a dinner visit.  For approximately five years, Mother and Father maintained equally shared physical custody of the Children while modifications were made to the original order in other ways, such as directing the parties to participate in co-parent counseling.  Order, 3/13/14.

Father, who is a dentist, continued to reside in the former marital home in Coopersburg, Lehigh County, which is located in the Southern Lehigh School District.  Trial Court Opinion, 1/13/20, at 3.  The Children, each of whom began parochial school in kindergarten, continued to attend the same school.  *Id.*

In 2015, Mother married F.C. (Stepfather).  Trial Court Opinion, 1/13/20, at 3.  The record reveals that Mother and Stepfather rented a home

---

[1] The trial court states that the order arises from the parties' cross-petitions to modify the existing custody order filed in November 2018, as well as their cross-petitions for contempt filed in July 2018.  Order, 1/13/20, at 1. However, the order on appeal does not dispose of the petitions for contempt. Indeed, during the relevant proceedings, the parties did not testify regarding their respective contempt petitions.

in Allentown, Lehigh County, until 2016, when they purchased a home in the Parkland School District, due to O.K., the oldest child, desiring to attend Parkland High School. *Id.* at 3-4.

On August 1, 2016, Mother and Father agreed to modify their custody schedule with respect to O.K. during the school year only. The order granted custody to Mother every Monday and Tuesday overnight and Father every Wednesday and Thursday overnight, and the parties alternating weekends of custody during the school year.

After attending Parkland High School for one year, O.K. informed Mother that she wanted to attend Southern Lehigh High School, and that she wanted to live with Father. *Id.* at 5-6. By August 1, 2017, "O.K. went to Father's house and has not returned to Mother's house except for short-term visits." *Id.* at 6.

On November 9, 2017, following cross-petitions for modification of the existing custody order with respect to O.K. and by consent of the parties, the court granted Father primary physical custody of O.K. The court also granted Mother partial physical custody of O.K., as she and O.K. may agree, during those alternating weeks when she had physical custody of J.K., G.K., and N.K.

Thereafter, by consent order dated June 14, 2018, the court directed "that commencing September 2018, all four children would attend school

within the Southern Lehigh School District. . . ."[2] Trial Court Opinion, 1/13/20, at 8. As such, in the fall of 2018, Mother and Stepfather sold their house and purchased a home in Coopersburg in the Southern Lehigh School District. *Id.* at 9.

In October 2018, J.K., who then was attending Southern Lehigh High School, told Mother that "O.K. was coming to pick him up because he has something important to discuss with Father. J.K. left Mother's house without her consent and has not returned to live there." *Id.* at 9-10.

On November 8, 2018, Mother filed a petition for special relief and petition for modification, wherein she requested that J.K. be immediately returned to her, and that she be granted primary physical custody of the Children. Mother alleged that Father has a long pattern of attempting to alienate O.K. and J.K. from her, and that he will attempt and be successful in doing the same with G.K. and N.K. *Id.* at 10. On November 9, 2018, Father filed a petition for modification of the existing custody order wherein he requested primary physical custody of J.K.[3]

_____

[2] The order also appointed Dr. Jane Tyler Ward as a family counselor and directed Father and Mother to contact Dr. Ward within ten days of the entry of the order. Order, 6/14/18, ¶ 2.

[3] By interim order dated December 3, 2018, the court directed the parties to share physical custody of J.K., G.K., and N.K. on an alternating weekly basis. The interim order granted Father primary physical custody of O.K., and Mother partial physical custody on those weeks when she had physical custody of the other children, as she and O.K. may agree. Finally, the interim order directed

The hearing on the petitions occurred on November 7, 8, and 15, 2019, and December 2, 2019. The trial court interviewed the Children *in camera* and, upon agreement of the parties, without the presence of counsel. N.T., 11/7/19, at 256.

During the hearing, Mother requested sole legal and primary physical custody of the younger children, G.K. and N.K. N.T., 11/7/19, at 134-35. Mother requested that Father have supervised physical custody of G.K. and N.K. on alternating weekends. *Id.* at 135. In addition, Mother presented the testimony of Stepfather and Ronald J. Esteve, Ph.D., a clinical psychologist who was appointed by the court to conduct a psychological and custody evaluation. Father requested to continue shared legal and physical custody of G.K. and N.K. on an alternating weekly basis. *Id.* at 222-23. In addition, Father presented the testimony of Robert M. Gordon, Ph.D., a psychologist whom he retained to critique Dr. Esteve's evaluation.

On July 13, 2020, the court granted Mother sole legal custody of the Children. The court granted Mother and Father physical custody of the Children as they

> may agree or, in the absence of such agreement, then Mother shall exercise primary physical custody of the [C]hildren and Father shall exercise partial physical custody of the [C]hildren as follows:

---

the parties to resume counseling with Dr. Ward, especially with respect to repairing the relationship between Mother and J.K. Trial Court Opinion, 1/13/20, at 10.

- 5 -

a.)	on alternate weekends from Friday after school or, if no school, then from 6:00 p.m. until Sunday at 7:00 p.m., and

b.)	one evening each week from after school or, if no school, from 5:00 p.m. until 8:00 p.m.

Order, 1/13/20, ¶ 2.

Further, the order set forth a holiday custody schedule and granted each parent two non-consecutive one-week periods each year for vacation. *Id.* at ¶ 14. In addition, the order provided:

13. [A supplemental order completing this paragraph will be issued when the court has secured the commitment from the appropriate individuals to provide counseling/therapy as addressed in the Memorandum Opinion filed concurrently with this order.]

Order, 1/13/20, ¶ 13.[4] Father timely filed a notice of appeal.[5]

Father presents three issues for our review:

---

[4] In its memorandum opinion, the trial court stated, "The two oldest children need reunification counseling with Mother. Father needs counseling to help him understand the consequences of his inappropriate behaviors and to manage his anger. Mother needs counseling to help with her self-esteem and potential suicidal ideation." Trial Court Opinion, 1/13/20, at 22-23. Upon review, no supplemental order exists in the certified record with respect to ¶ 13, *supra*.

[5] Father did not file a concise statement of errors complained of on appeal concurrently with his notice of appeal in contravention of Pa.R.A.P. 1925(a)(2)(i) and (b). Because Mother does not claim prejudice as a result of Father's procedural violation, and we discern none, we will not quash or dismiss his appeal. *See In re K.T.E.L.*, 983 A.2d 745 (Pa. Super. 2009).

A.      Whether the trial court further erred in accepting the expert testimony of Dr. Ronald Esteve and rejecting the testimony of Dr. Robert Gordon[?]

B.      Whether the [trial] court erred in awarding Mother sole legal custody of the . . . [C]hildren[?]

C.      Whether the [trial] court erred in awarding Mother primary physical custody of the . . . [C]hildren[?]

Father's brief at 16 (reordered for ease of discussion).

We review Father's issues according to the following scope and standard of review:

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

> *R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa. Super. 2009) (quoting *Bovard v. Baker*, 775 A.2d 835, 838 (Pa. Super. 2001)).  Moreover,

> [O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.

> The parties cannot dictate the amount of weight the trial court places on evidence.  Rather, the paramount concern of the trial court is the best interest of the child.  Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

- 7 -

*R.M.G., Jr., supra* at 1237 (internal citations omitted). The test is whether the evidence of record supports the trial court's conclusions. *Ketterer v. Seifert*, 902 A.2d 533, 539 (Pa. Super. 2006).

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014). In addition,

[T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (quoting *Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

The primary concern in any custody case is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well[-]being." *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006), *citing* *Arnold v. Arnold*, 847 A.2d 674, 677 (Pa. Super. 2004).

Child custody actions are governed by the Child Custody Act ("Act"), 23 Pa.C.S.A. §§ 5321-5340. The Act provides that, after considering the best interest factors set forth in Section 5328(a), the trial court "may award" any of the following seven types of custody that it determines is in the best interest of the child: primary physical custody, partial physical custody, sole physical

custody, supervised physical custody, shared legal custody, and sole legal custody. 23 Pa.C.S.A. § 5323(a).

Trial courts are required to consider "**[a]ll** of the factors listed in [S]ection 5328(a) . . . when entering a custody order." *J.R.M. v. J.E.A.,* 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original); *see also A.V.*, 87 A.3d at 823 (citation omitted) (providing that trial courts shall set forth the mandatory assessment of the Section 5328(a) best interest factors "prior to the deadline by which a litigant must file a notice of appeal"). This statutory Section provides as follows:

**§ 5328. Factors to consider when awarding custody.**

(a) *Factors.* – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

- 9 -

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

Instantly, the trial court set forth its assessment of the Section 5328(a) best interest factors in its opinion accompanying the subject order. The trial court weighed the following factors in Mother's favor: subsections (1), (2), (4), (8), (9), (10), (12), and (13). The court weighed none of the factors in Father's favor. The court weighed subsections (3) and (5) equally between the parties, and found subsections (2.1), (11) and (14) inapplicable in this case.[6, 7]

The court found determinative subsection (1), which party is more likely to encourage and permit frequent and continuing contact between the child and another party, stating "Neither party comes before the court with 'clean hands,' although Mother's transgressions are comparatively less serious and less sinister th[a]n Father's transgressions." *Id.* at 17. The court explained that Father has a

> long history of undermining and denigrating Mother, and manipulating the [C]hildren, [which] has only aided, abetted, and encouraged the two oldest children from not wanting to spend

---

[6] With respect to subsection (6), the Children's sibling relationships, the court found, "They are very close and get along well with each other. The two youngest children look up to and miss their two older siblings; the two oldest children say they miss their two youngest siblings." Trial Court Opinion, 1/13/20, at 20. With respect to subsection (7), the well-reasoned preferences of the Children, based on their maturity and judgment, the court found, "While the [C]hildren's testimony was insightful and telling, it was not determinative of any issue. Their testimony merely corroborated other evidence." *Id.*

[7] With respect to subsection (15), the mental and physical condition of a party or a member of the party's household, the court found that Mother, Father, and the Children need counseling, as set forth above. *See* n. 4, *supra*.

time with Mother even though the [interim] order requires it. Father has a problem managing his anger. He yells at the [C]hildren and uses inappropriate language in front of them, especially when he refers to Mother.

*    *    *

Furthermore, Father stated each child after the age of 15 ½ years should be able to decide for himself/herself whether to spend more time or less time with either parent[,] and that [the C]hildren should go into therapy if they thought they needed it. His is a rather cavalier attitude after [he] has poisoned their view of Mother, blamed her for his limitations and seduced them with a "secret cell phone," a car[,] and financial assistance for college.

*Id.* at 17-18; *see also* N.T., 11/7/19, at 83-85; 120-22.

The court also found determinative subsection (8), the attempts of the parent to turn the child against the other parent. The court found, "Father has effectively turned the two oldest children, O.K. and J.K., against Mother for no apparent reason other than being vindictive because of the breakup of the marriage and a resultant obligation to pay child support." Trial Court Opinion, 1/13/20, at 20. For example, the court concluded, "The only purpose of Father telling N.K. that he urinated on Mother's house because he was angry with her could have been to portray Mother in a negative light and disrespect her. Clearly, it was an attempt to manipulate the child to turn him away from Mother." *Id.* at 21; *see also* N.T., 11/7/19, at 121-122 (Mother testified, "[N.K.] came in and was kind of giggling that daddy told him a secret. Later on in the evening, he mentioned what the secret was. It was that [Father] had urinated on the side of our house and not to tell mommy. So I looked at our [security] camera[,] and he did.").

- 12 -

Finally, the court found determinative subsection (13), the level of conflict between the parties and their willingness and ability to cooperate with one another. The court stated:

Mother testified there is . . . chronic conflict between her and Father which has not improved over time. She characterized the level of conflict between them as high. Father described the level of conflict between them as "medium at most." In fact, the level of conflict between the parties is high. Father has fueled the conflict by undermining and denigrating Mother and blaming her directly to[,] or within the hearing of[,] the [C]hildren for his financial troubles. Father professes a willingness to cooperate with Mother, but he has little insight as to how insidious his behavior has been and how damaging it is to the [C]hildren and his credibility with Mother.

Trial Court Opinion, 1/13/20, at 22.

In his first issue on appeal, Father asserts that the court abused its discretion in accepting the testimony of the court-appointed expert, Dr. Ronald J. Esteve, and not his expert, Dr. Robert Gordon. Specifically, Father argues that Dr. Esteve's testimony is not credible because "he denies Mother and Father are in the same ballpark [regarding their personality problems] even though the[i]r [MMPI-2] test scores were similar." Father's brief at 48. Further, Father contends that Dr. Esteve testified that he has concerns about both parties, and that "the trial court's dismissal of Mother's issues and focus upon Father's issues is misplaced and not supported by the expert testimony." *Id.* at 48-49. In short, Father contends that Dr. Esteve's report was biased in favor of Mother. We disagree.

- 13 -

The trial court appointed Dr. Esteve in January 2019, to perform a psychological and custody evaluation. On August 16, 2019, Dr. Esteve submitted a seventy-four page report to the court. *See* N.T., 11/15/19, at Ex. P10. In his report, Dr. Esteve explained that Mother and Father participated in intensive, structured, and follow-up clinical interviews, and they participated in psychological testing in the form of a "Quick View Social History," MMPI-2, and MMPI-2-RF. In addition, Dr. Esteve interviewed the Children.

Dr. Esteve testified on direct examination that Mother expressed in the clinical interviews that she suffers distress regarding her relationship "with all four of her children and their father." N.T., 11/15/19, at 16. He explained that Mother's distress is due to believing that "all four of her children have been impacted by the chronic and unresolved conflict between her and [F]ather. . . . [And] she believed [F]ather is behaving in ways that have contributed to or damaged the [C]hildren as well as their relationship with her." *Id.* at 16-17. Dr. Esteve stated that Mother "self-reported a tendency toward experiencing depressed mood. . . ." N.T., 11/15/19, at Ex. P10, at 29.

In his report, Dr. Esteve stated that Mother's test results indicated that she has "excessive anxiety and possibly obsessive behavior. . . . In other circumstances the possibility of a paranoid disorder or paranoid personality would be evaluated. However, her suspicions are based upon real events and are not irrational or out of proportion." *Id.* at 28-29. Mother tested high regarding these areas, but Dr. Esteve opined that Mother's "presentation appears to be situational rather than characerological."[8, 9] *Id.* at 28.

With respect to Father, Dr. Esteve testified Father told him "that he believed that [Mother] was using the process to harass him or make things difficult for him." *Id.* at 40. Dr. Esteve testified on direct examination:

Q. Did [Father] indicate to you his attitude towards [Mother]?

A. Yes. Throughout my contact with [Father], he was very clear about his disregard for [Mother]. He volunteered, for example, that she lacked the mother gene[,] and I'm not quite sure what that means. Also, that he believes that she [is] very unsettled, that he believes that she is very unhappy. He also believed that she was just simply overreacting to different circumstances that might have resulted in conflict between the two of them.

Q. During your interview with [Father], did he refer to my client as an a------?

---

[8] "By definition, characterological means long-standing, enduring, pervasive, chronic. Situational means there's a great deal of variance in the presentation of whatever the particular signs are that I'm describing." N.T., 12/2/19, at 5.

[9] Dr. Esteve testified that Mother had one prior suicide attempt. N.T., 11/15/19, at 26-27. On direct examination, he opined that Mother's suicide attempt "would play a role [in his evaluation], but it does not determine who she is. It sounds to me like it was just a terrible dark moment for her." N.T., 11/15/19, at 27.

A. Yes.

N.T., 11/15/19, at 40.

Dr. Esteve testified regarding Father's responses to Mother's allegations during his clinical follow-up interview:

Q. Now in the follow-up interview, would that be the time that you presented to [Father] [Mother]'s concerns?

A. Yes.

Q. So did [Father] acknowledge texting [O.K.] and ask[ing] her to keep the cell phone secret from her mother?

A. Yes, he did.

\* \* \*

Q. Did [Father] acknowledge talking to the [C]hildren about child support and financial issues?

A. Yes.

Q. Did he acknowledge talking to [O.K.] about private school versus public school and to not tell mom?

A. I believe so. Yes.

\* \* \*

Q. Did [Father] acknowledge that his ex-girlfriend obtained a [Protection from Abuse (PFA)] against him?

A. Yes.

Q. Did he acknowledge showing [Mother] a gun?[10]

_____

[10] Mother filed a PFA petition against Father in 2011, with respect to him showing his gun to her. Mother testified that the court granted her a temporary PFA order. **See** N.T., 11/7/19, at 114, 156.

A. Yes.

\* \* \*

Q. Did he acknowledge telling [G.K.] you are dead meat the next time I see you?[11]

A. Yes.

---

[11] Mother testified on direct examination that, on the morning of G.K.'s 10th birthday in December 2018, Father called G.K. on the telephone. Mother testified:

I heard the entire conversation, because the house was quiet[,] and it was just her and I in the room. [Father] immediately said to [G.K.], why haven't I heard from you in two days[?] No happy birthday. She said, well, I called you four times yesterday. I called you twice in the morning. When did you call? I called you twice in the morning and twice at night. Well, did you call one time right after another, or did you space them out? She said, I called one right after the other. [Father] said, well, there's a reason I didn't answer the first time, and he said, I'm just so f--- --- p----- off right now[,] and I want to know is your mom going to let me take you to breakfast for your birthday[?] She said, I don't know. Did you text her? He said, I did but she's not answering my f------ question.

And we had planned that evening . . . to go out to dinner. So [Father] said to [G.K.], you better figure this out with your mom, because if she doesn't agree to this, then nobody is going to dinner tonight[,] and there's going to be a f------ war. He said, do you think this is how I wanted to talk to you on your birthday[?] I'm just so pissed off. [G.K.] started crying. . . . So then when I was talking to her, [Father] said, who's there, and she said, mommy. He said, has she been there the entire conversation[?] [G.K.] said, yes. He said, you're **dead meat** the next time I see you, and she started crying hysterically. . . .

N.T., 11/7/19, at 106-09 (emphasis added). During her interview with Dr. Esteve and her *in camera* interview with the court, G.K. described this telephone conversation with Father, which was consistent with Mother's testimony. N.T., 11/15/19, at 65; N.T., 11/8/19, at 39-41.

Q. Are all of those concerns that [Mother] raised?

A. Yes. . . .

Q. So when you said that [Mother]'s concerns were reality based is that based on [Father]'s responses to your questions?

A. There [*sic*] it is.

N.T., 11/15/19, at 43-45.

Dr. Esteve testified that Father "has just extreme disregard for Mother, [and he fails to] recognize what his role is in this conflict[,] and he doesn't seem to have any recognition how some of his statements and behaviors to the [C]hildren would damage the [C]hildren or intimidate the [C]hildren." ***Id.*** at 47. Dr. Esteve testified that Father's MMPI test results are "consistent with someone who is . . . immature and self-indulgent, manipulative, obnoxious, hostile, aggressive, somebody [who] is against authority, refuse[s] to accept responsibility for their own problems. . . ." ***Id.*** at 48.

Dr. Esteve explained that Father's testing profile "is usually viewed as having a personality disorder, probably a paranoid or passive-aggressive personality. Symptoms of a paranoid disorder are prominent in [Father's] clinical pattern. Further, this implies the signs and symptoms are long-standing, enduring and pervasive." ***Id.*** at 50-51.

With respect to Dr. Gordon's critique that he was biased in favor of Mother, Dr. Esteve refuted it. He explained:

I went through the same exact process with both of these parties and as I stated, there was nothing off the record and . . . there

- 18 -

[are] . . . things . . . that I said about [M]other that are critical and concerning about her.  If I were biased, I would ignore it, I would just pay attention to things that confirmed [M]other.  . . .

N.T., 11/15/19, at 101-02.  On cross-examination, Dr. Esteve further testified, "I have concerns about both of these parties.  As I said, I certainly didn't ignore my concerns about [M]other."  *Id.* at 113.

Nevertheless, Dr. Esteve testified that Mother and Father are not in the "same ballpark" regarding their personality problems even though they both had elevated MMPI-2 test scores.  *Id.* at 110.  Dr. Esteve stated, "The interpretation of the MMPI is difficult.  . . .  [I]t doesn't have 100 percent predictive value. . . ."  N.T., 12/2/19, at 45.  As such, Dr. Esteve explained that his conclusions regarding the personality problems of the parties are based on "a combination of history, which is extraordinarily important in terms of predictive value.  Recent history is a much higher predictive value than ancient history.  Also, clinical presentation, which I tried to summarize in my report in the mental status section, and objective psychological testing."  *Id.* at 43-44.  Importantly, Dr. Esteve stated, "When we talk about personality concepts, that's abstraction so people get confused in the process, hence my caution also about placing so much time and attention on the MMPI.  It's a useful tool.  It's a very useful tool, but that's what it is.  It's a tool."  *Id.* at 44-45.

Based on our thorough review of the relevant testimony, we discern no abuse of discretion by the court in its credibility determination in favor of Dr. Esteve and against Dr. Gordon. Father's first issue fails.

In his second and third issues, Father argues that the trial court abused its discretion in awarding Mother sole legal and primary physical custody of the Children. Father asserts that, since their separation in 2011, he and Mother have had shared legal custody of the Children. Father asserts that he is a fit parent and a source of security and love for the Children. Further, Father asserts that the court abused its discretion in the weight it placed on the Section 5328(a) best interest factors. We disagree.

Dr. Esteve made seven recommendations within a reasonable degree of psychological certainty. *See* N.T., 11/15/19, at Ex. P10, 73-74. He opined, "As long as these parents remain in chronic conflict[,] their [C]hildren will be damaged." *Id.* at Ex. P10, 73. He recommended that Mother and Father participate in parental counseling. In addition, Dr. Esteve recommended that Mother participate in psychotherapy due to her distress over the custody situation, and that she participate in therapeutic intervention regarding her relationship with O.K. and J.K. *Id.* With respect to Father, Dr. Esteve stated that he "demonstrates little insight or care in how his behavior has severely damaged his children, his relationship with his children and other relationships. . . . That his presentation is so consistent with one who easily perceives any challenge as a personal attack, he too may benefit from

- 20 -

psychotherapy." *Id.* Dr. Esteve recommended that the Children participate in individual psychotherapy. *Id.*

With respect to physical custody, Dr. Esteve recommended:

Although [Mother] seemed resigned to the position that she cannot regain her proper relationship and authority with the two older children, this Clinician is not convinced she is correct. This Clinician would strongly recommend that at bare minimum she have her initial partial custody time reinstated so that she can properly participate in her children's lives as well as provide proper parental supervision. Further, a joint custodial relationship is only likely to be successful when both parents communicate and coordinate well. In this instance, that is clearly not the case. Per the report of all, [Mother] is primarily focused on the [C]hildren's needs. [F]ather is not. . . . Hence, this Clinician would strongly recommend that [M]other have primary parental responsibility for [the C]hildren. In effect, this potentially limits to some degree [F]ather's manipulation of the [C]hildren and places the [C]hildren in a calmer and healthier environment.

N.T., 11/15/19, at Ex. P10, 74.

Dr. Esteve's recommendations are based, in part, on his interviews with the Children. On direct examination, Dr. Esteve testified regarding his clinical impressions of the Children in connection with Father's hostility toward Mother. N.T., 11/15/19, at 52-74. He opined that the Children "are struggling with conflicting loyalties." *Id.* at 69. With respect to O.K., Dr. Esteve stated, "[O.K.] was aware of her parents['] open conflict[,] and [F]ather's hostility and his clear expectation of their loyalty. . . ." *Id.* at 72. He testified, "I observed that the oldest daughter . . . made the choice to allow herself to live with her father and that appeared to be a choice that she now regretted. And [she] is trying to find a way to repair her relationship with her mother." *Id.*

With respect to J.K., Dr. Esteve testified:

Q. On the bottom of Page 62 [of his report], you note that [J.K.] observed his father's open contempt for his mother?

A. Yes.

Q. Can you describe how you came to that conclusion?

A. Well, the paragraph above it. He was describing his father's response, I believe, it was from a text message from [M]other. And if the [c]ourt will excuse me for swearing, but the father's response was "F--- her." This is, of course, in front of the child. [J.K.] understood that is his father's open contempt for his mother.

Q. And I am interested in [J.K.'s] explanation [for Father's behavior toward Mother] sta[r]ting on the bottom of Page 62 with he explained.

A. "I understand the differences between men and women." Or assumed he should believe that this is the difference between men and women. . . . Basically, that [Father] expressed his emotions[,] and this is the way a man is supposed to express his emotions.

Q. Is that healthy for fifteen, sixteen-year-old boy?

A. No, of course, not.

N.T., 11/15/19, at 60-61.

Dr. Esteve continued:

A. [J.K.] questioned rhetorically, "whose fault is it? Mom has a different philosophy. She doesn't want to discuss this or include me in this. Dad gets angry and vents."

Q. Is that important, Dr. Esteve?

A. That's extremely important. [H]ealthy parents protect the children[.] [H]ealthy parents recognize the importance of helping their children find . . . the best possible scenario. They help the child love the other parent. [Mother] certainly isn't going to be

- 22 -

openly critical or engage in the criticism against [Father]. [Father] is clearly very open and engaged in his contempt for [Mother].

Q. Did [O.K.] and [J.K.] both express to you that they feel that they are in the middle of this conflict?

A. Yes, of course.

N.T., 11/15/19, at 62.

Dr. Esteve testified regarding his interview of G.K., the parties' then eleven-year-old daughter:

Q. What did [G.K.] describe about her relationship with her father?

A. I asked her a question about her love of her parents[.] I asked her what [she] loved most about both of her parents, but I also asked her[,] if she had magic and could change one thing, but only one thing about each of her parents, what would she change? Now she volunteered that her father not be so upset and angry. And she cried and volunteered [that he] blame[s] a lot of things on the mom[.] [Father] doesn't talk nice about [Mother].

Q. Is that damaging to an eleven-year-old child, Dr. Esteve?

A. Yes, she is openly distressed. Of course, it is damaging. Her mother is her primary model. [I]f the father is open in his contempt and disregard for the mother, the children see that they are part [of] both their parents, that means [in G.K.'s mind], [Father] has [the] same contempt for part of who they are.

*Id.* at 63-64. Likewise, Dr. Esteve testified that N.K., the parties' then nine-year-old son, told him during his interview that he "wishes that his dad would stop yelling." *Id.* at 67.

The trial court's *in camera* interviews of the Children were consistent with those of Dr. Esteve. *See* N.T., 11/8/19, at 1-133. We particularly note

- 23 -

the testimony of G.K., then eleven years old, regarding Father's interactions with her, and how it makes her feel. She testified upon inquiry by the court:

A. [S]ometimes it makes me nervous going over to [Father's] house.

Q. Why is that?

A. Because sometimes he pulls me aside and asked me questions which makes me really nervous.

Q. What kind of questions does your dad ask that makes you nervous?

A. He asks me . . . if I want to keep living with my mom and, like, questions like that, where I want to live.

Q. What do you tell your dad?

A. I tell him I don't know.

Q. So let me understand this. Sometimes when you go over to your dad's, you feel nervous because your dad asks you some questions.

A. Uh-huh.

Q. And that makes you feel nervous.

A. Uh-huh.

Q. And the questions he asks are: Do you want to live with your mom, or do you want to live with your dad. What other questions does he ask you?

A. That's the main question. I don't really know what to say to him, and then he keeps going on.

Q. He keeps asking the same question[?]
A. Yeah, and brings up other things.

Q. And when you say it makes you nervous, does it make you feel anything else?

A. I don't really know how to answer him.

N.T., 11/8/19, at 36-37. G.K. subsequently testified, "I just wish that my dad would stop asking me questions and pulling me aside . . . because he does that every time I go to his house." *Id.* at 49. G.K. testified that it makes her feel "sad." *Id.* at 49. G.K. continued:

Q. Would you want me to talk to your dad about that? . . .

A. Maybe.

Q. Or would you rather I not say anything to your dad?

A. Probably not say anything.

Q. Are you sure?

A. I want him to change, but I'm nervous about telling him that because I don't tell him that.

Q. Anything else you want to tell me . . .?

A. Well, I'm nervous to say it, but once when I went to his house, he pulled me aside and we were talking outside for like two and a half hours.

*        *        *

Q. Anything else you want to tell me about that?

A. I can say what he said.

Q. You can tell me.

A. He told me not to tell anyone because it would get him in trouble. So I didn't[,] and then I told my mom.

Q. Do you want to tell me what it was?

A.  Well, he kind of said that -- I was just looking at the ground things -- about living at mom's house not eating sandwiches --

Q. I missed what you said.

A. Eating sandwiches, because I'm just looking at the ground, things like that, seeing my pets and stuff at mom's house, but I should look at reasons that actually matter. . . .

Q. Did he give you any examples?

A.  I'm not sure.  I have a paper just to remember what he said.

\*      \*      \*

He said that my mom listens to me on this Echo Dot thing.

Q.  What is Echo Dot?

A.  It's like Alexa.  . . .

\*      \*      \*

Q. And your dad told you that mom listens on the Echo Dot?

A.  Yeah, but it hasn't been plugged in for a while so. . . .

Q. What else did your dad say?

A.  He also said that he can only get me out of some stuff, and then . . . if I choose to live at mom's house, he can't get me out of things, like, switching schools or moving.  . . .

Q. Anything else on your paper you want to tell me about?

A.  Well, I have more about when he talked to me for that long. He also said that if [N.K.] and I choose to live at mom's house, he doesn't want to have the big house anymore, which makes me sad because that's, like, the house that I was born in.  He says, we're just going to move into a smaller house, [J.K.] and I, because [O.K.] will be going off to college[,] and you guys won't be here.  That scares me.

N.T., 11/8/19, at 50-52.

- 26 -

Upon thorough review, the trial court's factual findings set forth above, and those in its opinion accompanying the subject order, are supported by competent evidence. The court's legal and physical custody award is reasonable in light of those findings and its careful consideration of the Section 5328(a) best interest factors.[12] In sum, the court made credibility findings in favor of its appointed expert, Dr. Esteve, whose clinical impressions were consistent with the testimony offered during the subject proceedings by Mother, Father, and the Children. The court placed weight on Father's hostility towards Mother and its damaging effect on the Children, which we may not disturb. **A.V. v. S.T.**, 87 A.3d at 820 (citation omitted). Because we discern no abuse of discretion, Father's second and third issues on appeal fail. Accordingly, we affirm the custody order.

Order affirmed.

---

[12] With respect to the court's sole legal custody award, we also note that Mother's and Father's testimony revealed that Father did not cooperate with court orders directing that Mother, O.K., and J.K. participate in reunification counseling with Dr. Ward. Trial Court Opinion, 1/13/20, at 10, 12; N.T., 11/7/19, at 110, 200-02, 225-26. In addition, Dr. Esteve testified that Father was slow to cooperate with the evaluation process, and that Father failed to comply with his instruction to bring O.K. and J.K. to one of the evaluation meetings. N.T., 11/15/19, at 38-39, 106-07.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/14/20